## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re:

      IN SOOK STERLING

           Debtors.

_____/

STRATEGIC FUNDING SOURCE, INC.

       Plaintiff,

    v.

IN SOOK STERLING,

MTK 38 INC.,

JAY ENTERTAINMENT CORP.,

9 EAST 38TH STREET REALTY LLC,

and

JOHN DOE

       Defendants.

_____/

Chapter 7

Case No. 19-10132-scc

Adversary Pro. No. 19-01111-scc

## <u>AMENDED COMPLAINT</u>

Strategic Funding Source, Inc. d/b/a Kapitus ("<u>Plaintiff</u>" or "<u>Kapitus</u>" or "<u>Purchaser</u>") by its undersigned attorneys, files this Complaint under section 523 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "<u>Bankruptcy Code</u>") objecting to the dischargeability of a pre-petition debt owed by Defendants In Sook Sterling a/k/a In Sook Cho ("<u>Debtor</u>" or "<u>Owner</u>") and asserting related claims against the Debtor, MTK 38 Inc. d/b/a Japas 38 f/d/b/a/ Ichiban 71 Clinton LLC f/d/b/a May's Place, Inc. d/b/a Kirakuya ("<u>MTK</u>" or "<u>Merchant</u>"), Jay Entertainment Corp. d/b/a Japas NY ("<u>Japas NY</u>") and 9 East 38th Street Realty

LLC (the "<u>Landlord</u>") including claims for damages related to its conversion of property subject to Plaintiff's valid security interest, as evidenced by its timely filed UCC lien. In support hereof the Plaintiff alleges as follows:

## I. <u>JURISDICTION AND VENUE</u>

1.     This is a core proceeding under 28 U.S.C. §157(b)(2)(I) and is brought pursuant to 11 U.S.C. §§ 523(a) and rule 4007 of the Federal Rules of Bankruptcy Procedure.

2.     Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 157, 1334 and 523.

3.     Venue over the instant action properly lies in this Court pursuant to 28 U.S.C. §1409(a) because this Complaint arises in Debtor's Chapter 7 bankruptcy case.

4.     If the Court should find that this is not a core proceeding, Plaintiff consents to entry of final judgment by the Court.

5.     Notwithstanding any of the allegations and claims herein, the institution of this Adversary Proceeding, the filing of this complaint and any other appearance in this Adversary Proceeding and in the above-referenced bankruptcy case, including the submission of motions, opposition papers, and entry of orders, is without waiver, and express reservation, of any and all of Kapitus' rights, defense and remedies available at law and in equity, including, without limitation, under the Agreement (as defined below), Uniform Commercial Code, any other applicable federal or state law and/or commercial code, and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. If and when Kapitus files a proof of claim in the Bankruptcy Case (the "<u>Proof of Claim</u>"), Kapitus expressly incorporates any reservation of rights that it shall incorporate in the Proof of Claim.

6.     This Adversary Proceeding relates to the bankruptcy case In re In Sook Sterling, No. 19-10132-scc, (Chapter 7), filed in this Court (the "<u>Bankruptcy Case</u>").

## II.   THE PARTIES

7.      Plaintiff is and was, at all relevant times, a New York corporation with its place of business at 120 W. 45th Street, New York, New York 10036.

8.      Upon information and belief, Defendant Debtor is an individual residing in the state of New York at 201 East 36 Street, Apt. No. 16F, New York, New York, 10016.

9.      Upon information and belief, Defendant Debtor, is or was, at all relevant times, the co-owner and guarantor of Defendant MTK 38, Inc. d/b/a Japas 38, a New York corporation.   Upon information and belief, MTK was located at 9 E. 38th Street, New York, New York 10016.   Upon information and belief, MTK stopped operating on October 22, 2018.

10.     Upon information and belief, Defendant Jay Entertainment Corp. d/b/a Japas NY is a New York corporation with its principal place of business located at 9 E. 38th Street, New York, New York 10016.   Upon information and belief, Jay Entertainment is the successor in interest to MTK.

11.     Upon information and belief, Defendant 9 East 38th Street Realty LLC, successor in interest to 9 East 38th Street Owner, LLC, which itself was the successor in interest to 9 East 38th Street Associates, L.P., is a New York company.   The Landlord may be served by serving the New York Secretary of State.

12.     Upon information and belief, Defendant John Doe is an as of yet unidentified individual or entity that received fraudulent transfers from Defendants Debtor and/or MTK. Because the identifying information and the transactions that give rise to the claims against Defendant John Doe are in the possession of the Defendants, Plaintiff will seek to amend this Complaint to substitute the actual name of Defendant John Doe following discovery of the same from Defendants.

13.     Plaintiff is a secured creditor of MTK and an unsecured creditor with a claim against Debtor, in the amount of at least $60,628.00 (plus additional costs, fees, expenses, and interest), pursuant to the performance guarantee obligation of MTK executed by Debtor, as more fully detailed below.

### III.  GENERAL ALLEGATIONS

14.     Debtor filed for bankruptcy under Chapter 7 of the Bankruptcy Code on January 14, 2019 (the "Petition Date").

15.     Pursuant to Official Form 309A, filed on January 15, 2019, April 8, 2019 is the deadline to object to discharge.

16.     The original Complaint was timely filed.

### IV.  SPECIFIC FACTUAL ALLEGATIONS

17.     On August 13, 2018, Plaintiff entered into a Future Receivables Factoring Agreement (ACH) (the "Agreement") with MTK.   Under the Agreement, Plaintiff purchased $79,200.00 of MTK's future receivables for the purchase price of $55,000.00.  Plaintiff performed its obligations under the Agreement and delivered to Debtor, as owner of MTK, $55,000.00.  A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

18.     Debtor signed and authorized the Agreement as the owner of MTK and executed a separate Personal Guaranty of Performance (the "Guaranty"), whereby she personally guaranteed all representations, warranties, and covenants made by MTK in the Agreement. *See* **Exhibit A**, pp. 7–8.

### The Pre-Funding Call

19.     Prior to funding Debtor under the Agreement, Debtor participated in a recorded pre-funding call on or about August 13, 2018, as the owner and guarantor of MTK, and represented: (a) that she did not anticipate closing her business for any reason over the next twelve (12) months; (b)

that she did not anticipate selling her business in the next twelve (12) months; (c) that she did not anticipate filing for bankruptcy protection in the foreseeable future; (d) that she was current on her payments to her landlord; and (e) that she was not in arrears on any debt. The relevant portions of the Pre-Funding call are transcribed below:

> **Kapitus Representative**: Do you anticipate closing your business for any reason over the next 12 months, including planned vacation, renovations, seasonality, or slow business?
>
> **Debtor**: No
>
> **Kapitus Representative**: Do you anticipate selling your business in the next twelve (12) months?
>
> **Debtor**: No.
>
> **Kapitus Representative**: Have you been planning to file or do you have any reason to believe that your business would need to file for bankruptcy protection in the foreseeable future.
>
> **Debtor**: No, I just finished the renovations.
>
> **Kapitus Representative**: Are you current on your payment with your landlord for your business?
>
> **Debtor**: Yeah.
>
> **Kapitus Representative**: Are you in arrears on any loans or with any financial institution?
>
> **Debtor**: What do you mean, I don't understand.
>
> **Kapitus Representative**: Are you late on any payments with any other loan?
>
> **Debtor**: No, I'm not.
>
> **Kapitus Representative**: Do you currently have a balance with any other working capital provider?
>
> **Debtor**: Yeah.
>
> **Kapitus Representative**: And what provider?
>
> [inaudible]

**Debtor**:  Fox Funding.

**Kapitus Representative**: And how much is that for?

**Debtor**: That was for $50,000, but I almost paid.

**Kapitus Representative**:  But do you know what the balance is right now?

**Debtor**:  I don't know, I have to [inaudible]

**Kapitus Representative**: Ah, ok.

**Kapitus Representative**:  Do you recognize that a false statement or misrepresentation may constitute fraud and subject you to legal action?

[Kapitus Representative repeats the question several times]

**Debtor**: Yes.

### The Agreement

20.     As briefly outlined above, pursuant to the Agreement signed by Plaintiff and Debtor on August 13, 2018, Plaintiff purchased $79,200.00 of future accounts, monetary payments, and other general receivables generated in the course of Debtor's business, MTK (the "Receivables").

21.     To allow Plaintiff to collect its purchased Receivables, the Agreement required MTK to use only a single, specified depositing account to deposit all Receivables collected by MTK (the "Account"), which was designated by the parties in the Agreement and fully accessible to Plaintiff. *See* **Exhibit A**, Agreement, pp. 1, 3 §§ 1.1, 2.3.  From this account, the Agreement entitled Plaintiff to collect a portion of the daily batch amount of MTK's collected receivables via Automated Clearing House ("ACH") in the daily amount of $387.00 from the Account.  *See id.*, pp. 1, 4 §2.7.

22.     To avoid disruption, the Agreement prohibited changes to the Account or to the designation of the deposit account except with Plaintiff's express written consent.  *See id.* at p. 3 §1.1.

23.    Debtor, as owner and guarantor of MTK, also made the following representations

and warranties in connection with the Agreement:

**II.    REPRESENTATIONS, WARRANTIES AND COVENANTS.**
Merchant represents, warrants and covenants that as of this date and during
the term of the Agreement:

**2.1 Financial Condition and Financial Information.**  Merchant is solvent,
and no transfer of property is being made by Merchant and no obligation is
being incurred by Merchant in connection with this Agreement with the
intent to hinder, delay, or defraud either present or future creditors of
Merchant.   Merchant's bank statements and financial information, provided
to PURCHASER fairly represent the financial condition of Merchant at such
dates, and since those dates there has been no material changes, financial or
otherwise, in such condition, operation or ownership of Merchant.  Merchant
is current on any and all lease, rent or mortgage payments due.  No material
changes financial or otherwise, in the condition, operation or ownership of
Merchant are in any way expected or anticipated.  Merchant has a continuing,
affirmative obligation to advise PURCHASER of any material change in its
financial condition, operation or ownership.   PURCHASER may request
statements at any time during the performance of this Agreement and the
merchant shall provide them to PURCHASER within 5 business days.
Merchant's failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply
with all laws and has valid permits, authorizations and licenses to own,
operate and lease its properties and to conduct the business in which it is
presently engaged.

. . .

**2.5 Tax Obligations.** Merchant is currently in compliance with all federal
state and local tax laws, has filed all returns, and has paid all taxes due, except
as disclosed to PURCHASER.

 **2.6 Change of Name or Location.** Merchant will not conduct Merchant's
businesses under any name other than as disclosed to the PURCHASER or
change any of its places of business without ten (10) days prior written notice
to PURCHASER.

**2.7 Daily Batch Out.**   Merchant will batch out receipts with the Processor
on a daily basis.

. . .

**2.9 No Bankruptcy or Insolvency.**   As of the date of this Agreement,
Merchant represents that it is not insolvent and does not contemplate and has

not filed any petition for bankruptcy protection under Title 11 of the United States Code . . . Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Additional Financing.** Merchant shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form of a purchase of receivables or a loan to the business with any party other than PURCHASER without PURCHASER's written permission.

**2.11 Unencumbered Receipts**. Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of PURCHASER.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

*Id.* pp. 3–4.

24.     The Agreement also contained the following language, to which Debtor agreed when she executed the Agreement:

> **ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH ANY APPLICATION FOR FUNDING, IN ANY DOCUMENT SUBMITTED AND/OR THIS AGREEMENT WILL RESULT IN A SEPARATE CAUSE OF ACTION, INCLUDING BUT NOT LIMITED TO A CLAIM AGAINST THE OWNER/GUARANTOR FOR FRAUD OR FRAUDULENT INDUCEMENT**

*Id.* p. 2.

25.     Debtor further executed the Guaranty, a personal guaranty of MTK's full performance of all terms and obligations under the Agreement.  *See* **Exhibit A**, Guaranty, as attached to pp. 7–8 of the Agreement.

26.     MTK also entered into a Security Agreement, s*ee* **Exhibit A**, Guaranty, as attached to p. 7 of the Agreement, granting Kapitus a security interest in all of MTK's personal property

"including all accounts, chattel paper, cash, deposit accounts, documents, equipment, general intangibles, instruments, inventory, or investment property, . . . whether now or hereafter owned or acquired by Merchant and wherever located; and all proceeds of such property, as that term is defined in Article 9 of the UCC[.]" (collectively, the "<u>Collateral</u>").

27.     In reliance on the representations made by Debtor in the pre-funding call, the Agreement, and the Guaranty, Plaintiff provided the funding agreed to in the Agreement.

**<u>Debtor's Immediate Breach</u>**

28.     Almost immediately after its execution by the parties, Debtor and MTK materially violated the terms of the Agreement.  On October 25, 2018, Plaintiff's debits began returning as Insufficient Funds, and on November 1, 2018 the return code became "Stop Payment".  Plaintiff's Resolution Department made numerous attempts to reach Debtor and MTK, and on November 27, 2018, were advised that the restaurant had changed ownership.

29.     By no later than October 25, 2018, Debtor stopped depositing MTK's Receivables (or any other amounts) into the Account, thereby preventing Plaintiff from collecting its Receivables purchased from Debtor.  As the Agreement was executed by the parties on August 13, 2018, Plaintiff materially breached the Agreement a mere 2 months after its execution.

30.     Debtor paid only $18,572.00 of the $79,200.00 owed to Plaintiff, thereby leaving a secured balance of Receivables owed to Plaintiff in the amount of $60,628.00.

31.     Debtor has failed to fulfill her and MTK's obligations, either personally or as guarantor, to cure the debt owed to Plaintiff, and has defaulted under the Agreement and the Guaranty.  Accordingly, Debtor is liable to Plaintiff in the amount of $60,628.00 under the Agreement and Guaranty outlined above, plus additional costs, interests, and attorneys' fees, as demonstrated by the Agreement.

32.    At the Debtor's bankruptcy 341 Hearing, Debtor testified that she paid her employees in cash.  However, when Andrew Grossman, Esq. an attorney for another creditor, repeatedly asked about a safe on the premises and the cash stored in it, Debtor insisted that there was no cash kept at the restaurant.

33.    Debtor stated at the section 341 meeting that she was the sole owner and her ownership of the restaurant ended on October 31, 2018 and that the owner of the building took possession of the business according to a written agreement between them.  When pressed about the "agreement" she stated that she had an agreement with the landlord that if she did not pay rent for three months the landlord could take possession without an eviction proceeding.

34.    Upon information and belief, Debtor never intended to honor the representations made during the pre-funding call, in the Agreement, or in the Guaranty.  Instead, upon information and belief, Debtor was behind on her rent to the landlord, anticipated closing her business within the next twelve months, planned on selling her business within the next twelve months, and anticipated filing for bankruptcy in the foreseeable future.

35.    Specifically, according to Debtor's Voluntary Petition for Individuals Filing Bankruptcy (the "Petition"), MTK stopped operating on October 22, 2018, just over two months following the pre-funding call.  *See* ECF No. 1.  Then, on January 14, 2019, just five months after receiving funding, Debtor filed for bankruptcy.  Moreover, at Debtor's section 341 meeting, she represented that she had not paid rent since July 2018, which is a direct contradiction of her representation that she was current on her rent during her pre-funding call.

36.    Further, Debtor's Petition lists a litany of debt owed to 40 unsecured creditors, including Plaintiff, as well as $85,000 in tax obligations for MTK.  Other creditors include

American Express Bank, American Express Bank FSB, Bank of Hope, Chase, Citi Simplicity Visa, Citibank NA, Discover, Noah Bank, Prime Business, and Wilshire Bank.

37.     The vast majority of the debt in Debtor's Petition was debt incurred by MTK.  In fact, of the $1,898,458.47 of liabilities listed, $1,638,126.42 is attributed to debt or tax obligations of MTK.

38.     In short, Debtor was behind on payments to her landlord at the time when she represented otherwise during the pre-funding call and when she executed the Agreement and Guaranty, stopped operating MTK only two months later in October 2018, and filed for bankruptcy in January 2019 primarily due to the significant debt incurred on behalf of MTK.

39.     Debtor's conduct and statements demonstrate that Debtor obtained money from Plaintiff by false pretenses, false statements, or actual fraud.  Accordingly, the debt owed by Debtor to Plaintiff is non-dischargeable, and Plaintiff is entitled to an award of damages in the amount of $60,628.00, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

### Use of Kapitus's Collateral Following Breach

40.     In an effort to avoid the debt owed to Plaintiff, on or about October 22, 2018, MTK stopped operating and reopened as Jay Entertainment.  Jay Entertainment is located at 9 E. 38th Street, New York, New York 10016, the same address and building that MTK was located and operated.

41.     The restaurant is now owned and operated by a Jay Entertainment, which was originally incorporated in New Jersey and then formed as a New York Corporation on September 21, 2018.  An application for a Liquor License was made by Jay Entertainment on or about November 15, 2018.  Upon information and belief, Jay Entertainment is in receipt of assets that

were transferred to it from Debtor and/or MTK in an attempt to avoid the payment of Receivables purchased by, and which rightfully belong to, Plaintiff.

42.     Additionally, the online presence for the business remains under the name of MTK. Just as MTK, Jay Entertainment provides karaoke and Japanese fare in its business operations.

43.     Moreover, during the course of this litigation Plaintiff became aware that, upon vacating the premises, MTK allegedly surrendered its interest in its personal property to the Landlord.  However, such personal property is subject to the valid UCC lien filed by Plaintiff. Accordingly, Plaintiff has superior rights and interests in the property than the Landlord.  The Landlord's possession of the property belonging to Plaintiff, pursuant to its valid UCC lien, subjects it to claims for conversion, unjust enrichment and receipt of fraudulent transfers and remedies including constructive trust.

44.     Upon information and belief, Landlord leased Jay Entertainment an operational turnkey restaurant that used Kapitus's Collateral.  Upon information and belief, the Landlord and Jay Entertainment have been using Kapitus's Collateral and they are benefiting from the use of the Collateral without making any payments or restitution to Kapitus.  In particular, on information and belief, the Landlord is receiving higher lease payments from Jay Entertainment had it not been able to use the Collateral and/or Jay Entertainment has either directly realized money from and/or saved the costs by using Kapitus's Collateral.

45.     Upon information and belief, Defendant John Doe is also in possession of assets that were transferred to it from Debtor and/or MTK in an attempt to avoid the payment of Receivables purchased by, and which rightfully belong to, Plaintiff.

46.     Defendants' conduct is in violation of federal and state law, and entitles Plaintiff to judgment in the amount of $60,628.00 (plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper), the entirety of which is nondischargeable.

## PLAINTIFF'S CAUSES OF ACTION AGAINST DEFENDANTS

### COUNT I
**(Nondischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A) False Pretenses, False Representations, Actual Fraud)**

47.     Plaintiff repeats and realleges the above allegations set forth in the preceding paragraphs and incorporates the same herein as though more fully stated at length.

48.     Debtor's liability to Plaintiff, as alleged herein, is a debt for money owed and services provided within the meaning of 11 U.S.C. § 523(a)(2).

49.     Debtor obtained money and services by false pretenses, false representations, and/or actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).

50.     Pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, a debt in which a debtor obtains money by false pretenses, false statements, or actual fraud shall not be dischargeable.

51.     Debtor entered into the Agreement under false pretenses because despite her representations to the contrary, at the time of the Agreement she never had any intention to honor the Agreement or the Guaranty.  Instead, Debtor anticipated closing her business within the next twelve months, never had any intention to use the funding proceeds for business purposes, and anticipated filing for bankruptcy in the foreseeable future.  Additionally, in further contradiction of the representations made by Debtor on the pre-funding call, debtor was behind on her payments to her landlord at the time of the call and was in arrears on several loans.

52.     Upon information and belief, as fully detailed above, Debtor made false statements in connection with the pre-funding call and in connection with the warranties and representations

included in the Agreement and Guaranty.  Further, Debtor knew her statements were false, and, as a direct and proximate cause of these intentional misrepresentations and omissions, Debtor knew that Plaintiff would be induced to tender funding to Debtor.

53.    Upon information and belief, Debtor intended to induce Plaintiff to act or refrain from acting upon her false statements, and Plaintiff justifiably relied upon such false statements.

54.    Plaintiff suffered damages as a direct and proximate consequence of the false statements made by Debtor.

55.    As a result of false statements and fraud by Debtor, Debtor obtained from Plaintiff, inter alia, funding which would not have been authorized by Plaintiff if the false statements had not been made, or if material facts that were omitted and concealed, were actually disclosed.

56.    Debtor's statements and acts described above constitute conduct to obtain money by false pretenses, false statements or actual fraud.

57.    The Debtor's debt to Plaintiff is a debt for money, property, services, or an extension, renewal, or refinancing of credit, obtained by false pretenses, a false representation, or actual fraud, and is non-dischargeable.  Plaintiff is further entitled to an award of damages in the amount of $60,628.00, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

## COUNT II
### (Nondischargeability of Debt Pursuant to 11 U.S.C. §523(a)(2)(B) Materially False Statement with Intent to Deceive)

58.    Plaintiff repeats and realleges the above allegations set forth in preceding paragraphs and incorporates the same herein as though more fully stated at length.

59.    Debtor's liability to Plaintiff, as alleged herein, is a debt for money owed and services provided within the meaning of 11 U.S.C. § 523(a)(2).

60.     Pursuant to 11 U.S.C. §523(a)(2)(B), a debt in which a debtor obtains money by a statement in writing that is materially false respecting an insider's financial condition, on which the creditor reasonably relied, and which the debtor caused to be published with intent to deceive is nondischargeable.

61.     The Debtor and MTK, an insider of the Debtor, did obtain money from Plaintiff by the following written materially false statements in the Agreement respecting Debtor's and MTK's financial condition on which Plaintiff reasonably relied, among others:

a.     In the Agreement, Debtor represented to Plaintiff that Debtor intended to use the proceeds of the Agreement for business purposes. Specifically, the Debtor represented and promised to Plaintiff to use the proceeds exclusively for "business purposes and not as a consumer for personal, family or household purposes." *See* **Exhibit A**, Agreement, p. 4 § 2.12. Plaintiff justifiably relied on these representations to extend the financing and execute the Agreement.

b.     To allow Plaintiff to collect its purchased Receivables, the Agreement required Debtor to use only the Account to deposit all Receivables collected by MTK, which was designated by the parties in the Agreement and fully accessible to Plaintiff. *See* **Exhibit A**, Agreement, pp. 1, 4 §§ 1.1, 2.3. Plaintiff justifiably relied on these representations to extend the financing and execute the Agreement.

c.     The Agreement further contained the following representations that Plaintiff justifiably relied upon:

**II.     REPRESENTATIONS, WARRANTIES AND COVENANTS.**
Merchant represents, warrants and covenants that as of this date and during the term of the Agreement:

**2.1 Financial Condition and Financial Information.** Merchant is solvent, and no transfer of property is being made by Merchant and no obligation is being incurred by Merchant in connection with this Agreement with the intent to hinder, delay, or defraud either present or future creditors of Merchant. Merchant's bank statements and financial information, provided to PURCHASER fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant is current on any and all lease, rent or mortgage payments due. No material changes financial or otherwise, in the condition, operation or ownership of Merchant are in any way expected or anticipated. Merchant has a continuing, affirmative obligation to advise PURCHASER of any material change in its financial condition, operation or ownership. PURCHASER may request statements at any time during the performance of this Agreement and the merchant shall provide them to PURCHASER within 5 business days. Merchant's failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

. . .

**2.5 Tax Obligations.** Merchant is currently in compliance with all federal state and local tax laws, has filed all returns, and has paid all taxes due, except as disclosed to PURCHASER.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the PURCHASER or change any of its places of business without ten (10) days prior written notice to PURCHASER.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

. . .

**2.9 No Bankruptcy or Insolvency.** As of the date of this Agreement, Merchant represents that it is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code . . . Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**2.10 Additional Financing.** Merchant shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form of a purchase of receivables or a loan to the business with any party other

than PURCHASER without PURCHASER's written permission. 2.11 Unencumbered Receipts. Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of PURCHASER.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes

*See* **Exhibit A**, Agreement, pp. 3–4.

       d.      Plaintiff was to collect $387.00 per week from MTK via ACH debits. Plaintiff transferred the funding proceeds into the Account. Pursuant to the Agreement, MTK was to maintain the Account with sufficient funds to cover receivables payments to Plaintiff. Plaintiff relied on these representations to extend the funding and execute the Agreement. *Id.*, at p. 1.

62.      Upon information and belief, as fully detailed above, at the same time the representations were made, Debtor knew these representations were materially false, untrue and misleading.

63.      Debtor caused these false statements to be made in writing, including, but not limited to publishing such statements in the Agreement.

64.      MTK is an insider of Debtor, because, at the time of the Agreement and false statements, Debtor served as owner, managing member and/or person in control of MTK, within the meaning of "insider" under 11 U.S.C. § 101(31)(A)(iv).

65.      Plaintiff reasonably relied on these written statements made by Debtor in deciding to fund MTK under the Agreement.

66.      Plaintiff suffered damages as a direct and proximate consequence of the materially false statements made by Debtor.

67.     As a result of these materially false written statements by Debtor, Debtor obtained from Plaintiff, as owner and guarantor of MTK, inter alia, funding under the Agreement which would not have been authorized by Plaintiff if the materially false statements had not been made.

68.     Debtor's activities described above constitute obtaining money by materially false written statement regarding an insider's financial condition, on which Plaintiff relied, and which Debtor made with the intent to deceive.  Thus, Plaintiff is entitled to an award of damages in the amount of $60,628.00, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

69.     Further, Debtor's debt of $60,628.00 to Plaintiff (plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper)  is one for money obtained by materially false written statement regarding an insider's financial condition, on which Plaintiff relied, and which Debtors made with intent to deceive, and is nondischargeable.

## COUNT III
### (Non-dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(4)
### Fraud or Defalcation While Acting in a Fiduciary Capacity, Embezzlement, or Larceny)

70.     Plaintiff repeats and realleges the preceding paragraphs and incorporates the same as though set forth herein.

71.     Debtor's liability to Plaintiff as alleged herein, is a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" within the meaning of 11 U.S.C. § 523(a)(4).

72.     The Debtor signed the Agreement as the owner and representative of MTK.  Upon information and belief, Debtor is an officer, director, or other fiduciary of MTK.

73.     MTK is a New York corporation.  Under New York law, the officers and directors of a corporation have fiduciary duties to the corporation's creditors when the corporation is insolvent or in the zone of insolvency.

74.     Virginia law governs the Agreement.

75.     Under Virginia law, an express trust can be found through the parties' actions and does not need to be in writing.  All that is necessary is the unequivocal intent that the legal estate be vested in one person, to be held in some matter or for some purpose on behalf of another.  A trust is created if the intention is that the money be kept or used as a separate fund for the benefit of the payor or a third person.

76.     An express trust is a fiduciary relationship with respect to property.

77.     Here, the parties intended to and did enter into an express trust, and Debtor owed a fiduciary duty to Plaintiff.  Under the Agreement, Plaintiff purchased the entirety of the Receivables until they were paid full.  Debtor was to hold the Receivables in the Account for Plaintiff's benefit.  Debtor did not do so.

78.     Plaintiff believes and alleges that the Debtor entered into the Agreement with the specific intent to take funds from Plaintiff without any intent to repay these funds.

79.     On or about August 13, 2018, Plaintiff transferred $55,000.00, less deductions for related expenses as required under the Agreement, in reliance on the Debtor's statements in the Agreement and the pre-funding call.

80.     Debtor immediately defaulted on its obligations under the Agreement.  Within two months after the Plaintiff deposited $55,000.00 into the Account, the Debtor stopped depositing MTK's Receivables (or any other amounts) into the Account, thereby stealing the Receivables

purchased from Debtor for Debtor's own use. Plaintiff only debited a total of $18,572.00 in ACH payments from the Account.

81.     On information and belief, MTK was insolvent or in the zone of insolvency at the time the Debtor stopped depositing MTK's Receivables (or any other amounts) into the Account. Therefore, the Debtor owed a fiduciary duty to Plaintiff and its other creditors at the time it stopped the deposits into the Account.

82.     Debtor obtained the funds from the Agreement by committing fraud and defalcation while acting in a fiduciary capacity as the owner, managing member, shareholder, officer, and/or director of MTK.

83.     Upon information and belief, Debtor misappropriated significant portions of the funds and/or Receivables for her own benefit by fraudulent intent or deceit.

84.     Upon information and belief, Debtor transferred the funds and/or Receivables into accounts not accessible by Plaintiff, which constitutes larceny.

85.     Upon information and belief, Debtor used the funds and/or Receivables without explanation, reason or purpose relating to MTK's business.

86.     Alternatively, Debtor's misappropriation of the funds and/or Receivables was embezzlement because Plaintiff entrusted Debtor with the funds and/or Receivables and because Debtor may have obtained control over such funds and/or Receivables without authorization.

87.     The Debtor's debt to Plaintiff is a debt for larceny and/or embezzlement because the Debtor stole the Receivables to be deposited into the Account that Plaintiff acquired under the Agreement with the intent to permanently deprive the Plaintiff of those Receivables.

88.     Plaintiff sustained damages as a result of Debtor's fraud and defalcation while acting as a fiduciary, her embezzlement, and/or her larceny of the funds and/or Receivables.

89.     Debtor's obligation to Plaintiff is a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, and is nondischargeable.  Plaintiff is further entitled to an award of damages in the amount of $60,628.00, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

## COUNT IV
### (Non-dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6)
### Willful and Malicious Injury by the Debtor)

90.     Plaintiff repeats and realleges the preceding paragraphs and incorporates the same as though set forth herein.

91.     Pursuant to Section 523(a)(6) of the Bankruptcy Code, a debt incurred by a debtor who engages in willful malicious conduct which results in damage shall be non-dischargeable.

92.     Plaintiff believes and alleges that the Debtor entered into the Agreement with the specific intent not to use the proceeds from the Agreement for business purposes and not to repay the amounts owed under the Agreement. In addition, the Debtor made false statements to Plaintiff with the intent to induce Plaintiff to extend funds.

93.     Debtor immediately defaulted on its payment obligations under the Agreement. Plaintiff only debited a total of $18,572.00 ACH payments from the Account.  The Debtor thereafter stopped depositing funds into the Account, preventing Plaintiff from obtaining the Receivables it purchased from Debtor in the form of ACH payments from the Account as agreed to in the Agreement.

94.     Upon information and belief, the Debtor never had any intention to honor the Agreement.

95.     The Debtor also engaged in the following willful and malicious acts, among others:

   a.   The Debtor willfully and maliciously executed the Agreement in which she represented that her and MTK's financial condition was accurately reflected

in the documents produced to Plaintiff.

b. The Debtor willfully and maliciously executed the Agreement in which she represented that she intended to use the funds from Plaintiff for business purposes.

c. The Debtor willfully and maliciously made material omissions of fact that induced Plaintiff into transferring the funds to MTK, such as failing to disclose that she did not intend to pay the Receivables to Plaintiff as represented in the Agreement.

d. Plaintiff funded the purchase of Receivables to MTK based on the Debtor's false and fraudulent statements and acts.

96.     The Debtor's activities described herein constitute willful and malicious conduct which resulted in damage to Plaintiff.

97.     Consequently, Debtor engaged in willful and malicious conduct which resulted in damage to Plaintiff and is non-dischargeable.

98.     Accordingly, Debtor's debt to Plaintiff is non-dischargeable, and Plaintiff is entitled to an award of damages in the amount of $60,628.00, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

## COUNT V
### (Conversion Against Debtor, MTK, Jay Entertainment, Landlord, and John Doe)

99.     Plaintiff repeats and realleges the preceding paragraphs the same as though set forth herein.

100.    Plaintiff, pursuant to the Agreement, has a superior interest than Defendants Debtor, MTK, Jay Entertainment, the Landlord, and Defendant John Doe in the Receivables and other Collateral previously belonging to MTK.

101.    Defendants Debtor, MTK, Jay Entertainment, the Landlord, and Defendant John Doe, without authorization, wrongfully assumed and exercised dominion and control over the Receivables and other collateral previously belonging to MTK.

102.    Plaintiff was entitled to possession of the Receivables and other Collateral as a result of its superior interest under the Agreement.

103.    Plaintiff has asserted its superior interest in the Receivables and other Collateral to Jay Entertainment.

104.    Ignoring Plaintiff's asserted superior interest, Jay Entertainment has refused to turn over the Collateral.

105.    On information and belief, Debtor, MTK, Jay Entertainment and/or the Landlord have intentionally and without authority, assumed and exercised control over the Receivables and other Collateral properly belonging to Kapitus, interfering with Kapitus's right of possession. On information and belief, Debtor, MTK, Jay Entertainment and/or the Landlord have utilized and depleted the Receivables and other Collateral.  Upon information and belief, the Landlord has attempted to transfer either the right to use or ownership of some or all of the Collateral to Jay Entertainment under its lease

106.    Plaintiff seeks damages from Defendants Debtor, MTK, Jay Entertainment, the Landlord, and John Doe, and Defendant John Doe as a result of their conversion, including in the amount of $60,628.00, which represents the value of Receivables purchased and remaining owed to Plaintiff, plus attorneys' fees, costs incurred, punitive damages and such other relief as the Court deems just and proper.

## COUNT VI
## (Fraud Against Debtor and MTK)

107.     Plaintiff repeats and realleges the above allegations set forth in the preceding paragraphs and incorporates the same herein as though more fully stated at length.

108.     Debtor and MTK obtained money and services by actual fraud under Virginia law.

109.     Debtor and MTK, intentionally and knowingly, made false and material representations in the Agreement, and neither had any intention to honor the Agreement or the Guaranty.  Instead, Debtor and MTK anticipated closing their business within the next twelve months, never had any intention to use the funding proceeds for business purposes, and Debtor anticipated filing for bankruptcy in the foreseeable future.  Additionally, in further contradiction of the representations made by Debtor on the pre-funding call, Debtor and MTK were behind on payments to the Landlord at the time of the call, and were in arrears on several loans.

110.     Upon information and belief, as fully detailed above, Debtor made false statements in connection with the pre-funding call and in connection with the warranties and representations included in the Agreement and Guaranty.  Further, Debtor knew her statements were false, and, as a direct and proximate cause of these intentional misrepresentations and omissions, Debtor and MTK knew that Plaintiff would be induced to tender funding to them.

111.     Upon information and belief, Debtor and MTK intended to induce Plaintiff to act or refrain from acting upon her false statements, and Plaintiff justifiably relied upon such false statements.

112.     Plaintiff suffered damages as a direct and proximate consequence of the false representations made by Debtor and MTK.

113.     As a result of false statements and fraud by Debtor and MTK, they obtained from Plaintiff, inter alia, funding which would not have been authorized by Plaintiff if the false

representations had not been made, or if material facts that were omitted and concealed, were actually disclosed.

114.     On or about August 13, 2018, Plaintiff transferred $55,000.00, less deductions for related expenses as required under the Agreement, in reliance on the Debtor's false and material representations in the Agreement and the pre-funding call.

115.     Debtor and MTK entered into the Agreement with the specific intent to take these funds from Plaintiff without any intent to repay these funds.

116.     Debtor and MTK's statements and acts described above constitute actual fraud under Virginia law.

117.     Upon information and belief, Debtor misappropriated significant portions of the funds and/or Receivables for her own benefit by fraudulent intent or deceit.

118.     Upon information and belief, Debtor transferred the funds and/or Receivables into accounts not accessible by Plaintiff.

119.     Upon information and belief, Debtor used the funds and/or Receivables without explanation, reason, or purpose relating to MTK's business.

120.     Upon information and belief, MTK transferred the funds and/or Receivables into accounts to Jay Entertainment in order to avoid making payments to Plaintiff under the Agreement.

121.     Debtor and MTK promptly defaulted on their payment obligations under the Agreement.  Plaintiff only debited a total of $18,572.00 ACH payments of the $79,200.00 of Receivables purchased by Plaintiff from MTK.

122.     Plaintiff is entitled to an award of damages in the amount of $60,628.00, plus attorneys' fees, costs incurred, punitive damages, and such other relief as the Court deems just and proper.

## COUNT VII
### (Fraudulent Transfer Against Jay Entertainment, the Landlord, and John Doe)

123.     Plaintiff repeats and realleges the above allegations set forth in the preceding paragraphs and incorporates the same herein as though more fully stated at length.

124.     Plaintiff also asserts actual intent fraudulent transfer claims and constructive fraudulent transfer claims against Defendants Jay Entertainment, the Landlord, and/or John Doe with respect to the transfer of any and all assets to Jay Entertainment, the Landlord, and/or John Doe.

125.     Under N.Y. Debt. & Cred. Law §§ 270-281 and Va. Code Ann. § 55-80 (and any other similar state law applicable here under), a transfer is voidable as to a creditor, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud a creditor of the debtor, or of the debtor made the transfer or incurred the obligation without fair consideration or receiving reasonably equivalent value.

126.     The Debtor and MTK intended to hinder, delay, or defraud Plaintiff from transferring the Collateral to the Landlord, Jay Entertainment and/or John Doe.

127.     In addition to those facts specifically pled above, many of the additional factors considered as probative of fraudulent transfer under the applicable law are present in this case.  For example: (a) the transfers were concealed; (b) the transfers occurred at times when the Debtor was threatened with litigation; (c) the Debtor's business operations were folding and the Debtor was in the process of re-establishing her business through a new company within the same business market; (d) the Debtor had concealed assets and information from creditors; (e) the Debtor received little, if any, value in exchange for the transfers; and (f) the transfers occurred when the Debtor was insolvent.

128.     Jay Entertainment, the Landlord, and John Doe were on constructive notice of Plaintiff's security interest in the Collateral.

129.     The elements of "actual intent" are satisfied by the facts set forth herein.  Plaintiff is entitled to avoid all of the transfers to Jay Entertainment, the Landlord, and/or John Doe under applicable state law.

130.     In addition, the Debtor and MTK transferred the Receivables and other Collateral to Jay Entertainment, the Landlord and/or John Doe without fair consideration or receiving reasonably equivalent value.   Upon information and belief, Jay Entertainment, the Landlord and John Doe did not give MTK any consideration for the Collateral.

131.     The elements of a "constructive" fraudulent conveyance are satisfied by the facts set forth herein.   Plaintiff is entitled to avoid all of the transfers of the Collateral to Jay Entertainment, the Landlord, and/or John Doe under applicable state law.

132.     Pursuant to N.Y. Debt. & Cred. Law §§ 270-281 and Va. Code Ann. § 55-80, judgment should be entered avoiding the transfers of the Collateral to Jay Entertainment, the Landlord and/or John Doe, entering judgment against each of the Defendants in favor of Plaintiff for the value of the property transferred, plus interest, attorney's fees and costs.

### COUNT VIII
**(Successor Liability against Jay Entertainment)**

133.     Plaintiff repeats and realleges the above allegations set forth in the preceding paragraphs and incorporates the same herein as though more fully stated at length.

134.     On or about October 22, 2018, MTK stopped operating.  Upon information and belief, Jay Entertainment began operating at that same time.

135.     While it was in business, MTK was located at 9 E. 38th Street, New York, New York 10016.

136.     Jay Entertainment is located at 9 E. 38th Street, New York, New York 10016, the same address and building that MTK was located and operated.

137.     Upon information and belief, Jay Entertainment is the same entity as MTK.   For example, the online presences for the business remains under the name of MTK.

138.     Upon information and belief, the primary business of MTK and Jay Entertainment is identical.   Both are in the business of providing karaoke and Japanese fare.

139.     Upon information and belief, the transfer of assets from MTK to Jay Entertainment was done to avoid paying a debt owed by MTK to Plaintiff.

140.     Accordingly, Plaintiff is entitled to an award of damages from Jay Entertainment in the amount of $60,628.00, plus attorneys' fees, costs incurred, and such other relief as the Court deems just and proper.

## COUNT IX
### (Replevin Against MTK, Jay Entertainment, the Landlord, and John Doe)

141.     Plaintiff repeats and realleges the above allegations set forth in the preceding paragraphs and incorporates the same herein as though more fully stated at length.

142.     The Agreement is a valid enforceable agreement.

143.     MTK has defaulted on its obligations under the Agreement by virtue of, *inter alia*, the events of default identified above and failing to pay all amounts due thereunder and thus, Plaintiff has been damaged.

144.     Debtor has defaulted on her obligations under the Guaranty by virtue of, among other things, the events of default identified above and failing to pay all amounts due thereunder and thus, Plaintiff has been damaged.

145.     Plaintiff has a duly perfected first priority security interest in the Collateral.

146.    In accordance with the Agreement, Plaintiff is entitled to exercise all rights and remedies available to it at law or in equity, as well as those available to a secured party under the Uniform Commercial Code.

147.    The Uniform Commercial Code provides that "… after default, a secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties." UCC § 9-609(c).

148.    The secured party's right to possession of the collateral upon default may be asserted against a third party in possession, which may not properly refuse upon the secured party's request for delivery.

149.    Plaintiff has demanded Jay Entertainment to turn over the Collateral.    On information and belief, Jay Entertainment was in possession of the Collateral on the day of the demand and continues to be in possession of the Collateral on the day hereof.    Jay Entertainment has not turned over the Collateral to Plaintiff.

150.    By reason of Defendants' wrongful retention of the Collateral, Plaintiff is entitled to an order for replevin under section 9-609(c) of the Uniform Commercial Code.

## COUNT X
**(Unjust Enrichment against Jay Entertainment and Landlord, and Imposition of Constructive Trust)**

151.    Plaintiff repeats and realleges the above allegations set forth in the preceding paragraph and incorporates the same herein as though more fully stated at length.

152.    Upon information and belief, Landlord leased Jay Entertainment an operational turnkey restaurant that used the Collateral.

153.    Upon information and belief, Landlord and Jay Entertainment have been benefiting from the use of the Collateral without making any payments or restitution to Kapitus for the use of the Collateral.

154.     Landlord and Jay Entertainment retention and use of the Collateral is unjust and Landlord and Jay Entertainment have been unjustly enriched by using the Collateral without making payments or restitution to Kapitus for use of the Collateral.

155.     By reason of the foregoing, Defendants are liable to Plaintiff in an amount to be determined at trial, but no less than $60,628.00.

156.     By reason of the foregoing, Defendant is entitled to the imposition of a constructive trust because Landlord and Jay Entertainment are receiving unjust enrichment through the use of the Collateral that rightly belongs to Kapitus.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Debtor as follows:

A.     For an order providing that the debt owed by Debtor is non-dischargeable in the instant bankruptcy case, in any other proceeding under Title 11 to which this case may be converted, and in any future bankruptcy case filed by or against the Debtor;

B.     Judgment declaring the entire debt owed by Debtor to Plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. §523(a)(2)(B), 11 U.S.C. § 523(a)(4), and 11 U.S.C. § 523(a)(6);

C.     Judgment against Debtor, MTK, Jay Entertainment, Landlord, and John Doe for conversion;

D.     Judgement against Debtor and MTK for fraud;

E.     Judgment against Jay Entertainment, the Landlord, and John Doe for fraudulent transfer,

F.     Judgement declaring Jay Entertainment Corp. as a successor in liability for the debt incurred by MTK;

G.     Judge granting an order for replevin under section 9-609(c) of the Uniform Commercial Code;

H.     Judgment against Jay Entertainment and Landlord for unjust enrichment and imposition of constructive trust over the Collateral;

I.     Granting Plaintiff an award of damages from Defendants in the amount of $60,628.00 plus interest;

J.      Granting attorneys' fees and costs herein incurred;

K.      Granting Plaintiff an award of punitive damages; and

L.      Granting such other and further relief as this Court may deem just and proper.


Dated: June 10, 2020

DIAMOND McCARTHY LLP

*/s/ Charles M. Rubio*
Charles M. Rubio
295 Madison Avenue, 27th Floor
New York, NY 10017
Phone: (212) 430-5400
crubio@diamondmccarthy.com

*Counsel to Strategic Funding Source Inc.*
*d/b/a Kapitus, Inc.*